UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
                                                    :
L'OREAL USA, INC.,                                  :
                                                    :
                              Plaintiff,            :
                                                    :
              -v-                                   :
                                                    :
TREND BEAUTY CORP. and JOHN DOES                    :
1-50,                                               :
                                                    :
                              Defendants.           :
                                                    :
---------------------------------------------------------- X

```
┌─────────────────────────────┐
│ USDC-SDNY                   │
│ DOCUMENT                    │
│ ELECTRONICALLY FILED        │
│ DOC #:                      │
│ DATE FILED:  8|15|13        │
└─────────────────────────────┘
```

No. 11 Civ. 4187 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff L'Oreal USA, Inc. ("L'Oreal") brings this action against Defendants Trend

Beauty Corporation ("Trend Beauty") and John Does 1-50 asserting claims under the Lanham

Act and state law. Trend Beauty now moves for partial summary judgment and partial judgment

on the pleadings and L'Oreal moves for summary judgment as to all claims. For the following

reasons, both motions are granted in part and denied in part.

I.      Background

        A.      Factual Background[1]

        L'Oreal is a world-renowned manufacturer of luxury products. (Pl. 56.1 ¶ 1.)  It is the

exclusive licensee of several famous trademarks when the marks are applied to luxury

fragrances. (Id. ¶¶ 29, 42 & 43.)  Trend Beauty was an unauthorized wholesaler of several of

L'Oreal's luxury fragrances and had sold such fragrances to unauthorized retailers including

---

[1]      The following facts are drawn from L'Oreal's Rule 56.1 statement in support of its motion for summary
judgment ("Pl. 56.1"), Trend Beauty's response thereto ("Def. Resp. 56.1"), Trend Beauty's Rule 56.1 statement in
support of its motion for partial summary judgment ("Def. 56.1"), L'Oreal's response thereto ("Pl. Resp. 56.1"), and
the exhibits incorporated into the parties' 56.1 statements.  Where only one party's Rule 56.1 statement is cited, the
other party does not dispute the fact asserted, has offered no admissible evidence to refute the fact or merely objects
to inferences drawn from the fact.

CVS, Walgreens, Walmart, Rite Aid and Target.  (Steven Meltzer Decl., Jan. 17, 2013 ("Meltzer Decl.") ¶ 2.)[2]   At issue in this litigation is whether Trend Beauty's unauthorized sale of counterfeit and "decoded" L'Oreal fragrances in the "gray market" interfered with L'Oreal's ability to control the quality of its products and whether the counterfeit and decoded products materially differed from L'Oreal's "coded" products so as to constitute, *inter alia*, trademark and trade dress infringement.

### 1.    The Armani Marks

On or about October 1, 1996, G.A. International Diffusion B.V. ("Armani") entered into a license agreement with L'Oreal S.A.[3] (the "Armani/L'Oreal S.A. Agreement").  Pursuant to the agreement, L'Oreal S.A. was granted a license to use Armani's trademarks, GIORGIO ARMANI, ACQUA DI GIO and ARMANI CODE (the "Armani Marks"), "for the manufacture, distribution, sale, advertising and promotion" of perfume across the world, with the exception of the Republic of Italy, the Republic of San Marino and the Vatican State. (Def. 56.1 ¶ 5; Def. Ex. C §§ 1.16, 2.1.)  This agreement was effective from January 1, 1996.  (Def. 56.1 ¶ 6; Def. Ex. D § 1.11.)  Also on or around January 1, 1996, Prestige Et Collection International ("PCI") entered into a license agreement with Cosmair, the former name of L'Oreal. (the "PCI/L'Oreal Agreement").  (Def. 56.1 ¶ 1.)  PCI had been substituted for L'Oreal S.A. in the implementation of the Armani/L'Oreal S.A. Agreement, (Def. Ex. D § 1.11), thus vesting PCI with the exclusive

---

[2]      At oral argument, L'Oreal suggested that the Court should not consider the declaration of Steven Meltzer, the president and owner of Trend Beauty, or portions thereof, because it is "self-serving" and "non[-]evidentiary." (Oral Argument Tr., July 10, 2013 ("Tr."), 17:10-11.)  The Court disagrees.  As the Second Circuit has explained, a non-movant's declaration can suffice to defend against a motion for summary judgment as long as it complies with Federal Rule of Civil Procedure 56(c)(4), such that is based on personal knowledge, sets out facts that would be admissible in evidence and shows that the affiant or declarant is competent to testify on the matters included therein.  See Danzer v. Norden Sys., Inc., 151 F.3d 50, 57 & n.5 (2d Cir. 1998); Fed. R. Civ. P. 56(c)(4).  Because Meltzer's declaration—which was submitted in opposition to L'Oreal's motion for summary judgment—satisfies these requirements, the Court considers it as documentary evidence submitted by Trend Beauty.

[3]      L'Oreal is a wholly owned subsidiary of L'Oreal S.A.  (Pl. Opp'n Ex. 56 (Jose Monteiro Decl., Jan. 3, 2013) ¶ 3.)

license to the Armani Marks, as provided for in the Armani/L'Oreal S.A. Agreement.  Pursuant

to the PCI/L'Oreal Agreement, PCI granted L'Oreal "the exclusive right and license to exploit"

fragrances and cosmetic products bearing the Armani Marks in the "United States of America

and its territories and possessions."  (Id. §§ 1.7, 2.1.)  Pursuant to these agreements, L'Oreal is an

exclusive licensee but not the owner or registrant of the Armani Marks.  (Def. 56.1 ¶ 3.)

The Armani Marks are registered with the United States Patent and Trademark Office

("USPTO"), (Pl. 56.1 ¶¶ 31-33), and GIORGIO ARMANI and ACQUA DI GIO are

incontestable under 15 U.S.C. § 1065.  (Id. ¶ 40.)  The Armani Marks are used in connection

with the following L'Oreal luxury fragrances: GIORGIO ARMANI and ACQUA DI GIO are

used with the ACQUA DI GIO fragrance, and GIORGIO ARMANI and ARMANI CODE are

used with the ARMANI CODE (Women) fragrance.  (Id. ¶ 41.)  As of April 2012, the ACQUA

DI GIO fragrance was the number one ranked men's fragrance in the United States year-to-date

and month-to-date.  (Id. ¶ 46.)

### 2.    The Ralph Lauren Marks

On or about January 1, 1985, Ricky Lauren and Mark Kaplan entered into a licensing

agreement on behalf of Ralph Lauren with L'Oreal (the "Ralph Lauren Agreement").  Pursuant

to the agreement, L'Oreal was granted the "exclusive right, license and privilege" to use the

Ralph Lauren trademarks, RALPH LAUREN, POLO BLACK, POLO RALPH LAUREN,

RALPH LAUREN ROMANCE and RL (the "Ralph Lauren Marks"), in connection with the

manufacture, marketing and sale of fragrances, scents and cosmetic products in the United States

and its territories and possessions.  (Def. Ex. E §§ 1, 2.2.)  L'Oreal is not the owner or registrant

of the marks.  (Def. 56.1 ¶ 3.)

The Ralph Lauren Marks are registered with the USPTO, (Pl. 56.1 ¶¶ 34-39), and are

incontestable under 15 U.S.C. § 1065, (id. ¶ 40).  The Ralph Lauren Marks are used in connection with the following luxury L'Oreal fragrances: POLO BLACK, RALPH LAUREN, RL and the Polo Player Logo are used with the POLO BLACK fragrance; POLO RALPH LAUREN and the Polo Player Logo are used with the POLO RALPH LAUREN and POLO BLUE fragrance; and RALPH LAUREN ROMANCE and RALPH LAUREN are used with the RALPH LAUREN ROMANCE fragrance.  (Id. ¶ 41.)  As of April 2012, the POLO BLUE, POLO BLACK and POLO fragrances were ranked numbers seven, ten and twelve, respectively for men's fragrances in the United States year-to-date and month-to-date.  (Id. ¶ 47; Pl. Ex. 42.)

### 3. Packaging of the L'Oreal Fragrances[4]

L'Oreal's fragrances "are packaged and sold in carefully designed and manufactured bottles (the 'primary packaging') and boxes (the 'secondary packaging')."  (Pl. 56.1 ¶ 53.) L'Oreal describes the secondary packaging of the relevant fragrances as follows, which Trend Beauty does not dispute:

- **ACQUA DI GIO:** The secondary packaging "features a tall box in a slightly textured, matte white fiber with a top embossed with the GIORGIO ARMANI mark and 'Parfums,' and with the ACQUA DI GIO and GIORGIO ARMANI marks in an elegant, serifed font matching that on the primary packaging."  (Id. ¶ 52(a); Pl. Ex. 4 (photographs of genuine ACQUA DI GIO).)

- **POLO BLACK:**  The secondary packaging "features a tall rectangular glossy black box, on which front face features the POLO BLACK mark in large glossy silver lettering in elegant, serifed, capital letters, beneath which is embossed in glossy silver the iconic Polo Player and RALPH LAUREN marks."  (Pl. 56.1 ¶ 52(b); Pl. Ex. 5 (photographs of genuine POLO BLACK).)

- **POLO BLUE:**  The secondary packaging "features a tall rectangular glossy blue box, on which front face appears in glossy silver the iconic Polo Player POLO mark, beneath which in glossy silver lettering in serifed, capital letters, appears the POLO RALPH LAUREN composite marks."  (Pl. 56.1 ¶ 52(c); Pl. Ex. 7 (photographs of genuine POLO BLUE).)

---

[4]     The Ralph Lauren Marks and the Armani Marks are collectively referred to as the "L'Oreal Marks."

- **POLO RALPH LAUREN:**  The secondary packaging "features a tall rectangular dark green matte box with the iconic Polo Player mark engraved in gold in the center of the top, the front face featuring an embossed gold border and, in the top half of the front face, the POLO RALPH LAUREN word and composite marks, featuring the iconic Polo Player in gold."  (Pl. 56.1 ¶ 52(d); Pl. Ex. 6 (photographs of genuine POLO RALPH LAUREN).)

- **RALPH LAUREN ROMANCE:**  The secondary packaging "features a short rectangular pale pink box with glossy silver top and bottom, with each face bordered in glossy silver, and with an overlaid, raised repeating diamond geometric pattern, with the RALPH LAUREN ROMANCE mark in a serifed font printed on the front face in dark grey, matte, capital letters."  (Pl. 56.1 ¶ 52(e); Pl. Ex. 8 (photographs of genuine RALPH LAUREN ROMANCE).)

- **ARMANI CODE (WOMEN):**  The secondary packaging "features a tall rectangular, glossy box in a dark violent ombré fading to lavender, adorned at the top front face with the dark silhouettes of flowers and the ARMANI CODE and GIORGIO ARMANI marks in embossed, serifed lettering."  (Pl. 56.1 ¶ 52(f); Pl. Ex. 9 (photographs of genuine ARMANI CODE (WOMEN)).)

(Pl. 56.1 ¶ 52.)  L'Oreal contends that its packaging is distinctive, which Trend Beauty disputes. (Pl. 56.1 ¶¶ 49-50; Def. Resp. 56.1 ¶¶ 49-50; Meltzer Decl. ¶ 54 ("L'Oreal's packaging, bottle, actuators and caps[] are no more distinctive or unique than numerous other high-end, designer fragrances.").)

### 4.    L'Oreal's Coding Methods

L'Oreal employs three coding methods on the primary and secondary packaging of its fragrances: the Anti-Diversion/Quality Assurance ("AD/QA") Code, the Seal Vector and the Daylot Code.  In addition, a Universal Product Code ("UPC") is placed on the fragrances by suppliers and retailers.

### a.    The AD/QA Code

The AD/QA Code is a 10-digit serial number encoded as a bar code that is unique to each fragrance unit.  (Pl. 56.1 ¶ 57; Thomas Barden Dep.[5] 70:19 (The AD/QA Code is "similar to a

---

[5]    The parties have submitted several exhibits of deposition excerpts from the depositions of L'Oreal employees—Gary Morris, Diana McCarthy and Thomas Barden—and Trend Beauty personnel—Steven Meltzer

license plate.").)  It exists on the secondary packaging in a number of locations in both visible and ultraviolet ink.  (Pl. 56.1 ¶ 58.)  The AD/QA Code has been used on all relevant L'Oreal fragrances at all times relevant to this action.  (Def. Opp'n Ex. S at 5.)  It can be used to identify to whom L'Oreal originally sold the product.  (Diana McCarthy Dep. 36:4-7; Barden Dep. 29:6-17.)  According to L'Oreal, the AD/QA Code "serves many purposes," including "quality assurance, anti-diversion, anti-theft, and anti-counterfeiting."  (Pl. 56.1 ¶ 59; Barden Dep. 29:21.)  Trend Beauty disputes L'Oreal's assertion that the AD/QA Code is used for "quality assurance, anti-theft and anti-counterfeiting purposes," and contends that it is primarily used for anti-diversion purposes.  (Def. Resp. 56.1 ¶ 59.)[6]

### b.      The Seal Vector

The Seal Vector is a "coded printed square" that is located on the secondary packaging of certain L'Oreal fragrances.  (Pl. 56.1 ¶¶ 54-55.)  It has been used on ACQUA DI GIO at all times relevant to this action; for other relevant products, it has been used at certain times.  (Def. Opp'n Ex. S at 5.)  The parties agree that a genuine Seal Vector is "nearly impossible to copy. . . . [A] counterfeit Seal Vector can be identified with the naked eye."  (Pl. 56.1 ¶ 55; McCarthy Dep. ("McCarthy Dep.") 47:16-21.)  When scanned, the Seal Vector provides "information regarding who produced the carton, when it was produced, what product it is."  (Gary Morris Dep. 32:23-33:2.)  Like the AD/QA Code, L'Oreal asserts that the Seal Vector is used for "quality assurance, anti-diversion, anti-theft, and anti-counterfeiting purposes."  (Pl. 56.1 ¶ 59; Barden Dep. 69:13-17 ("[T]he [S]eal [V]ector is the primary authentication tool that we use to authenticate whether or not a unit is genuine or counterfeit.").)  Trend Beauty concedes that the Seal Vector is used for

---

and Angela Vergara.  For ease of reference, the Court refers to the deposition excerpts by the deponent's name only.

[6]       "Diversion" refers to the unauthorized distribution of L'Oreal's fragrances from authorized distributors to unauthorized distributors and wholesalers who in turn sell to unauthorized retailers of L'Oreal's fragrances.

anti-counterfeiting purposes, but disputes L'Oreal's assertion that it is used for "quality assurance, anti-diversion and anti-theft purposes."  (Def. Resp. 56.1 ¶ 59.)

### c.      The Daylot Code

The Daylot Code (or lot or batch code) is imprinted on the bottom of the primary and secondary packaging of the fragrances at the time of manufacturing and provides the location and date of production.  (Morris Dep. 37:7-9; Barden Dep. 40:23-41:13; McCarthy Dep. 35:4-12.)  The Daylot Code applies to a "lot" of the product and not to an individual fragrance unit.  (See Morris Dep. 38:7-16; see also Oral Argument Tr., July 10, 2013 ("Tr."), 35:25:36-1 ("The [D]aylot [C]ode identifies the batch.").)  The Daylot Code has been used on all relevant L'Oreal fragrances at all times relevant to this action.  (Def. Opp'n Ex. S at 5.)

### d.      The UPC

In addition to the above-referenced codes, all products have a UPC which is a numeric code that identifies the supplier of a product.  (Pl. 56.1 ¶ 82; Barden Dep. 27:19-20.)  The UPC sticker is placed on products by the supplier and is used to track inventory.  (Tr. 9:7-11, 24:6-11 (explaining that nearly all suppliers of consumer products put a UPC sticker on the product for inventory control purposes, including suppliers of L'Oreal fragrances to retailers like Bloomingdale's and suppliers such as Trend Beauty to retailers like Walgreens).)

### 5.      Decoding of L'Oreal's Fragrances

A decoded fragrance is one that has had its AD/QA Code and/or Seal Vector removed.  (Pl. 56.1 ¶ 60; Barden Dep. 158:25-59:4; Steven Meltzer Dep. 32:8-12.)  The parties agree that the decoding process "involves removing L'Oreal's cellophane wrapper, removing the bottle from the box, and taking apart and otherwise damaging the secondary packaging."  (Pl. 56.1 ¶ 63.)  The ultraviolent AD/QA Codes might be "washed out" on the secondary packaging by

decoders, (Pl. 56.1 ¶ 61; Meltzer Dep. 74:10-13; Vergara Dep. 26:4-11), or the AD/QA barcode or Seal Vector might be cut out and replaced with a sticker or fake barcode.  (Pl. 56.1 ¶ 62; Meltzer Dep. 74:3-9, 163:22-25; Morris Dep. 104:24-105:8 ("[M]any of the defaced products have actually been opened as far as the cello[phane] wrap removed, the bottle removed, the carton is actually unglued. The code in the glue joint of the carton is cut out, then the carton is reglued, put back together.").)

L'Oreal asserts that the removal of the AD/QA Code and/or Seal Vector has several consequences.  First, L'Oreal contends that decoding makes it difficult to identify a genuine L'Oreal product from a counterfeit.  (Pl. 56.1 ¶ 64; Barden Dep. 45:24-46:3 ("Without the bar code, without the [S]eal [V]ector, it would be difficult to identify a genuine product from a counterfeit product.").)  Trend Beauty contests this assertion with regard to the removal of the AD/QA Code.  (Def. Resp. 56.1 ¶ 64.)  In support of its position that the AD/QA Code is used, rather, for anti-diversion purposes, it cites testimony of L'Oreal employees that the AD/QA Code is used to track products and trace their distribution channel.  (See Morris Dep. 80:19-20 (The AD/QA Code is "for tracking your product and knowing the source of your product."), Barden Dep. 29:5-16, 30:9-19, 32:14-19, 71:18-22 ("The unique number can be traced to the authorized distribution channel."); McCarthy Dep. 56:7-18 (describing how L'Oreal uses the AD/QA Code as part of L'Oreal's Buy Back program and can trace it to the "original source").)  It further refers to testimony of L'Oreal employees regarding their ability to identify a counterfeit product through visual inspection without the assistance of the AD/QA Code and/or Seal Vector. (Morris Dep. 40:10-48:21, 94:13-95:21 (describing a "tips list" he created to help identify counterfeit products), 98:14-25; McCarthy Dep. 46:18-47:9 (explaining that she could "look at a unit and see if it's counterfeit or not"), 138:8-9.)

Second, L'Oreal asserts that it loses the ability to determine if a unit was stolen when the AD/QA Code and/or Seal Vector has been removed from the secondary packaging.  (Pl. 56.1 ¶ 67; McCarthy Dep. 148:14-15; 156:18-23 (explaining that it is not possible to "trace" a decoded unit to determine if it is part "stolen . . . cargo" and that "[t]he code will tell [L'Oreal] if it's part of a stolen good or not"); Barden Dep. 158:14-21 (The removal of the AD/QA Code hinders L'Oreal's ability "to determine the source of the product or to determine if the product was stolen or counterfeit.").)  Trend Beauty disputes this statement.  (Def. Resp. 56.1 ¶ 67.)  In support thereof, Trend Beauty asserts that the Daylot Code—which is not removed from the fragrances—can be used independently from and as effectively as the AD/QA Code to determine if a product is stolen.  (See id. (citing Morris Dep. 36:5-25, 37:5-25, 38:4-16; Barden Dep. 41:5-23).)  It also cites testimony that the AD/QA Code and Seal Vector were not on every unit, in an effort to cast doubt on the usefulness of such devices in determining whether a unit was stolen or counterfeit.  (Morris Dep. 84:9-25 (describing which products contain an AD/QA Code or Seal Vector).)

Third, L'Oreal contends that it loses the ability to control the quality of its product in the distribution chain when the codes are removed.  (Pl. 56.1 ¶ 66; McCarthy Dep. 148:18-21 ("In case of a recall, there is no way to tell, you know, if the product is part of the recall or not.); Morris Dep. 104:15-06:19.)  Trend Beauty disputes this assertion as well.  (Def. Resp. 56.1 ¶ 66.)  It relies on L'Oreal testimony that there has not been a recall on fragrances, (Morris Dep. 102:23-03:6), and further contends that the Daylot Code can be used to control the quality of its product, (see Def. Resp. 56.1 ¶ 66 (citing Morris Dep. 36:5-25, 37:5-25, 38:4-16; Barden Dep. 41:5-23); Meltzer Decl. ¶ 8 (Other manufactures "have the ability to initiate precise recalls and also identify stolen merchandise just from [the] Daylot [C]odes.")).

Finally, L'Oreal asserts that when the fragrances are decoded, "[t]he product is no longer a [l]uxury product. . . . [It] [m]akes them a shoddy."  (Pl. 56.1 ¶ 68; Barden Dep. 159:7-13, 173:24-74:5 ("When pieces of our product are cut out . . . and what appears to be a small white Post-[I]t is cut over a seal vector, when an exacto knife goes through our secondary packaging and something is pasted over it, it's not a [l]uxury product."); McCarthy Dep. 148:24-25 ("It's not a luxury product anymore.  It's defaced.  It's not up to our standards."); Morris Dep. 106:22-25.)  According to L'Oreal, such damage to the secondary packaging is "visible at once."  (Pl. 56.1 ¶ 63.)  L'Oreal submitted photographs and physical exhibits as representations of the physical differences between the coded and decoded products.  (Pl. Exs. 35-40; Tr. 18:19-21:17; 29:24-30:25.)  Trend Beauty contests these allegations.  (Def. Resp. 56.1 ¶ 63.)  It contends that the decoding process need not damage the secondary packaging in a way that is "visible at once."  (Id.  But see Angela Vergara Dep. 26:7-8 (describing decoding as "visible").)  It also asserts that a customer would not notice products that were decoded through removal of the barcode and replacement with a white strip.  (Meltzer Dep. 103:18-04:5.)  Trend Beauty claims that it only sold goods that "look[ed] good," that is, "[i]f they [were] decoded[,] [they] need[ed] to be nicely decoded."  (Vergara Dep. 99:18-20, 95:11-19 (explaining that the goods could not be "sloppy," such as where the codes are cut and no sticker is put on the packaging); Meltzer Decl. ¶ 46.)  Trend Beauty submitted photographs and physical exhibits in support of its position. (Def. Opp'n Exs. A-D (decoded units held at L'Oreal's counsel's office); Def. Opp'n Exs. E-J (juxtaposition of coded fragrances purchased at Bloomingdale's and decoded fragrances purchased at CVS, Walgreens and Nordstrom Rack); Tr. 64:15-66:20.)[7]  According to Meltzer,

---

[7]       The decoded units in Exhibits E through J and the physical units provided by Trend Beauty at oral argument are not products that were sold by Trend Beauty but were purchased from mass retailers.  Meltzer, however, avers that they are representative of the products that Trend Beauty sold.  (Tr. 73:11-17; Meltzer Decl. ¶ 23.)

decoded products "never lost [their] identity as a L'Oreal product."  (Meltzer Decl. ¶ 57.)

### 6.   L'Oreal's Buy Back Program

Three times per year, L'Oreal conducts a "Buy Back Program" during which it purchases certain L'Oreal fragrances—including those relevant to this action—from unauthorized retailers in several markets in the United States.  (Pl. 56.1 ¶ 80; McCarthy Dep. 40:22-24.)  L'Oreal asserts that the program, as part of its Quality Assurance program, targets anti-diversion, anti-counterfeiting and anti-theft.  (Barden Dep. 21:3-7; McCarthy Dep. 16:16-20.)  Trend Beauty disputes that the Buy Back Program serves any purpose other than anti-diversion.  (Def. Resp. 56.1 ¶ 80.)

L'Oreal's Buy Back purchases are two-fold.  First, it hires a third-party vendor, Guardsmark, "to purchase intact [coded] units" from unauthorized retailers "so [L'Oreal] could have a really good traceability rate."  (McCarthy Dep. 127:10-14.)  L'Oreal provides Guardsmark with a guidance manual regarding the types of products to purchase and from where.  (Def. Opp'n Ex. T (Buy Back Manual); McCarthy Dep. 19:14-18.)  Second, L'Oreal employees purchase decoded units from unauthorized retailers.  (McCarthy Dep. 127:14-24; Barden Dep. 157:6-25 (describing decoded products purchased during the Buy Back).)  From the purchased units, L'Oreal collects the Daylot Code on the primary packaging to determine the date of production and purchase, the UPC to learn who supplied the unit to the unauthorized retailer, and the AD/QA Code if it is present on the unit to determine where the product was originally sold.  (McCarthy Dep. 44:7-21; Def. Opp'n Ex. U (Buy Back Data); Def. Opp'n Ex. V (Buy Back Reports).)  Through this information, L'Oreal tracks the distribution channels, which is important "[t]o see where, how the gray market is . . . evolving and where the product is coming from."  (McCarthy Dep. 109:24-10:2.)  U.S. distributors have been terminated as a result

of their diversion activities.  (Barden Dep. 32:14-19; McCarthy Dep. 110:22-11:11.)

In 2009, in the ordinary course of its Buy Back Program, L'Oreal discovered counterfeit ACQUA DI GIO units.  (Pl. 56.1 ¶ 81; Barden Dep. 20:9-24.)  L'Oreal traced the UPC on the counterfeit units—number 752625—to a company called Seacoast Seafood, Inc.  (Pl. 56.1 ¶¶ 83, 88; Barden Dep. 72:22-73:8.)  Decoded products purchased during the Buy Back also bore the Seacoast Seafood UPC.  (Pl. 56.1 ¶ 84.)  In September 2010, CVS advised L'Oreal that the UPC registered to Seacoast Seafood was in fact being used by Trend Beauty.  (Pl. 56.1 ¶ 86; Pl. Ex. 44 (Email from CVS to L'Oreal, Sept. 21, 2010).)[8]

### 7.    Trend Beauty's Sales of L'Oreal Fragrances

As an unauthorized distributor of L'Oreal's fragrances, Trend Beauty sold both coded and decoded units, (Pl. 56.1 ¶ 21; Meltzer Dep. 28:12-14; Meltzer Decl. ¶ 46), although the parties disagree about how many decoded fragrances were in fact sold.  (Pl. 56.1 ¶ 22 (asserting that out of 450,000 units of L'Oreal fragrances, likely hundreds of thousands of them were decoded); Def. Resp. 56.1 ¶ 21; Meltzer Decl. ¶¶ 43, 68 (disagreeing with Vergara's estimate that 50% of L'Oreal fragrances sold were decoded, and estimating that 75% of the fragrances were coded).)  It is undisputed, however, that Trend Beauty knew that it was selling decoded products bearing the L'Oreal Marks and was content in doing so.   (Pl. 56.1 ¶¶ 23-24; Meltzer Dep. 28:15-17; 121:14-17.)   Trend Beauty asserts, however, that when it purchased decoded goods, it required that they be "nicely decoded."  (Meltzer Decl. ¶ 46.)  L'Oreal submits several examples of Trend Beauty purchase orders that contain language indicating that the fragrances must be "clean or nicely decoded."  (Pl. Exs. 32-34.)

With regard to the counterfeits, Trend Beauty first denied that it sold them but has since

---

[8]       Trend Beauty has admitted that it had been using Seacoast Seafood's UPC number even though it was not registered to Trend Beauty and it was never authorized to do so by Seacoast Seafood.  (Pl. 56.1 ¶¶ 89-91.)

conceded that it sold 190 to 200 counterfeit units of ACQUA DI GIO, all of which were supplied by Marlu Trading, Inc., an importer wholly owned and operated by Meltzer.  (Pl. 56.1 ¶¶ 6, 72, 74, 94, 102; Meltzer Dep. 52:10-20 (explaining that Trend Beauty places a control number ("CN") on each UPC to track the supplier, and that all counterfeits contained CN 271, which corresponds to Marlu); Pl. Ex. 30.)  The parties disagree as to whether Trend Beauty knew or should have known that some of the units were in fact counterfeit.  (Pl. 56.1 ¶¶ 94-100, 105-06; Def. Resp. 56.1 ¶¶ 94-100, 105-06.)

As of January 2013, L'Oreal has located 191 counterfeit units of ACQUA DI GIO, approximately 4,879 units of decoded ACQUA DI GIO, and examples of decoded units of POLO RALPH LAUREN, POLO BLACK, RALPH LAUREN ROMANCE and ARMANI CODE (WOMEN).  (Pl. 56.1 ¶ 108.)  The majority of the counterfeit units (174 of 191) bore Marlu's CN 271.  (Id. ¶ 109.)

### B.  Procedural History

L'Oreal commenced this action on June 20, 2011 against Trend Beauty and John Does 1-50 asserting twenty causes of action under the Lanham Act and state law.  Trend Beauty now moves for partial summary judgment and partial judgment on the pleadings, and L'Oreal moves for summary judgment as to all claims.  The Court held oral argument on the parties' motions on July 10, 2013.  For the following reasons, Trend Beauty's motion for partial summary judgment is granted in part and denied in part, and L'Oreal's motion for summary judgment is granted in part and denied in part.

## II.  Standard of Review

Summary judgment may be granted only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of showing that it is entitled to summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  In reviewing the record, the Court must assess the evidence in "the light most favorable to the [non-moving party]" and resolve all ambiguities and draw all inferences in its favor.  See Tufariello v. Long Island R.R. Co., 458 F.3d 80, 85 (2d Cir. 2006).  A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  Anderson, 477 U.S. at 248.  "[I]f there is any evidence in the record from any source from which a reasonable inference in the [non-moving party's] favor may be drawn, the moving party simply cannot obtain [] summary judgment."  Binder & Binder PC v. Barnhart, 481 F.3d 141, 148 (2d Cir. 2007).  In making this determination, the court is not to weigh the evidence and determine the truth of the matter or make credibility determinations, but rather must determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 253-54.

When cross-motions for summary judgment are made, the same standards apply.  See Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001).  "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."  Id.

## III.   Discussion

### A.   Standing

#### 1.   Trademark Infringement Pursuant to 15 U.S.C. § 1114(1)

L'Oreal brings six claims for trademark infringement pursuant to § 32 of the Lanham Act, 15 U.S.C. § 1114(1).  Trend Beauty asserts that L'Oreal, as a licensee, lacks standing to assert its trademark infringement claims because it is neither the assignee nor the legal

representative of the registrants of the marks.   In response, L'Oreal relies on the license agreements, as well as supporting documents from L'Oreal and the registrants, to argue that it has standing to bring its § 1114(1) claims.

"In every federal case, the party bringing the suit must establish standing to prosecute the action."  Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11 (2004).  In the context of trademark infringement claims, § 1114(1) grants standing to the owner or registrant of the relevant trademarks.  ITC Ltd. v. Punchgini, Inc., 492 F.3d 135, 145-46 (2d Cir. 2007); Berni v. Int'l Gourmet Rests. of Am., Inc., 838 F.2d 642, 645-46 (2d Cir. 1988).  The term "registrant" is further defined to include the registrant's "legal representatives, predecessors, successors and assigns."   15 U.S.C. § 1127.   It is undisputed that L'Oreal is not the owner, registrant, predecessor or successor of the L'Oreal Marks.  Accordingly, L'Oreal only has standing to bring its trademark infringement claims if it qualifies as a legal representative or assignee of the registrants.  For the following reasons, the Court concludes that L'Oreal does not have standing under § 1114(1) and thus dismisses those claims.

### a.      Assignment

### (1)      Legal Standard

"[A]ssignment of a trademark under the Lanham Act requires (1) the sale or transfer of all rights in the mark; and (2) assignment as well of the business's good[]will connected with the mark's use."[9]  Prince of Peace Enters. v. Top Quality Food Mkt., LLC ("Prince of Peace"), 760 F. Supp. 2d 384, 391 (S.D.N.Y. 2011); see also 15 U.S.C. § 1060(a)(1) ("A registered mark . . . shall be assignable with the good will of the business in which the mark is used, or with that part

---

[9]        "Good will is the value attributable to a going concern apart from its physical assets-the intangible worth of buyer momentum emanating from the reputation and integrity earned by the company."  Prince of Peace Enters. v. Top Quality Food Mkt., LLC ("Prince of Peace"), 760 F. Supp. 2d 384, 391 n.6 (S.D.N.Y. 2011).  "[A] trade name or mark is merely a symbol of good[]will; it has no independent significance apart from the good[]will it symbolizes."  Id.

of the good will of the business connected with the use of and symbolized by the mark."); see also Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd., ("FTE"), No. 11-4109-cv, 2013 WL 3970048 at *9 (2d Cir. Aug. 5, 2013) (The Second Circuit "appear[s] to have accepted that a transfer of an ownership interest in a mark is a predicate to standing for any putative 'assign.'") (citing DEP Corp. v. Interstate Cigar Co., 622 F.2d 621, 622 (2d Cir. 1980)).  Assignments must also be in writing.  § 1060(a)(3).

Exclusive licensees to a trademark are deemed assignees under § 1114 in limited circumstances.  "[A]n exclusive licensee only has standing if the licens[e] agreement grants the licensee a property interest in the mark or otherwise assigns to the licensee the registrant-licensor's ownership rights."  Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l B.V. ("FTE"), No. 04 Civ. 8510 (GBD), 2011 WL 4005321, at *7 (S.D.N.Y. Sept. 1, 2011) (quoting Telebrands Corp. v. Del Labs., Inc., 719 F. Supp. 2d 283, 293 (S.D.N.Y. 2010)), aff'd 2013 WL 3970048 (An exclusive licensee "must show that its 'license' amounts, in fact, to an assignment to establish entitlement to sue under Section 32(1).").  On the other hand, "when an agreement places obligations regarding the trademark on the alleged assignee and indicates that the trademark is owned not by the assignee but by the assignor, a court should read that agreement as a license and not as an assignment."  Prince of Peace, 760 F. Supp. 2d at 391 (citing Calvin Klein Jeanswear Co. v. Tunnel Trading, No. 98 Civ. 5408 (THK), 2001 WL 1456577, at *4-5 (S.D.N.Y. Nov. 16, 2001)).  Only when the court finds that the assignment is valid under the Lanham Act does the assignee then "gain the right to bring a civil action."  Prince of Peace, 760 F. Supp. 2d at 391 (citing Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V., 623 F.3d 61, 68 (2d Cir. 2010)).

Courts in this Circuit "look[] to the terms of the license agreement to determine whether

the licensee held a property interest in the mark, becoming effectively an assignee for standing purposes." Telebrands Corp., 719 F. Supp. 2d at 293.  Factors that courts consider include: (1) whether the license agreement "imposes geographical limitations on the use of the trademark;" (2) whether the agreement "requires the licensee to maintain the trademark's quality and reserves [to the licensor] the right to monitor the licensee's product quality;" (3) whether "the rights and duties in the license agreement are inconsistent with assignment;" and (4) whether the "license agreement states that the licensor retains ownership of the trademark." FTE, 2011 WL 4005321, at *7 (finding no assignment where the license agreement stated that the owner remained the owner of the trademarks, did not exclude the owner and imposed restrictions on plaintiff's trademark rights); Prince of Peace, 760 F. Supp. 2d at 391-92 (finding no assignment where an agreement limited the licensee's right to use trademarks and stated that the licensor remained the owner of the marks).

### (2)    Application to the Armani Marks

L'Oreal asserts that it has standing to bring its § 1114(1) actions because it was assigned Armani's rights under the Armani/L'Oreal S.A. Agreement.  Because L'Oreal was not itself a party to this agreement, however, it cannot rely on its language to demonstrate an assignment.[10] Accordingly, L'Oreal must show that it was assigned Armani's rights in some manner, which it is unable to do.

---

[10]    The Court rejects L'Oreal's argument that the parent-subsidiary relationship, on its own, is sufficient to confer an assignment of rights to L'Oreal.  See Abraxis Bioscience, Inc. v. Navinta LLC, 625 F.3d 1359, 1366 (Fed. Cir. 2010) (in the context of patent infringement, "[c]ommon corporate structure does not overcome the requirements" to transfer title); Hertz Corp. v. Knickerbocker, 206 F. Supp. 305, 306 (S.D.N.Y. 1962) (finding that parent did not have standing to bring infringement action for trademarks registered by subsidiary because the "definition of 'registrant' . . . does not include 'related company'").  L'Oreal's reliance on G.H. Mumm Champagne v. Eastern Wine Corp., 142 F.2d 499 (2d Cir. 1944), is inapposite as it predates the Lanham Act and the Second Circuit's jurisprudence regarding assignment of trademark rights.  Moreover, the Armani/L'Oreal S.A. Agreement does not assume that the license will be assigned to L'Oreal S.A.'s subsidiaries; rather, it expressly permits L'Oreal S.A. to grant sub-licenses to its subsidiaries.  (Def. Ex. C § 14.2.)  As discussed below, the PCI/L'Oreal Agreement is such a sub-license.

L'Oreal's argues that it is the assignee of L'Oreal S.A.—and thus, the registrant—pursuant to the PCI/L'Oreal Agreement.[11]   Although L'Oreal is a party to this agreement, the agreement does not grant L'Oreal a property or ownership interest in the marks, and the Court must therefore construe it as a license agreement and not an assignment of ownership rights. Although section 2.1 grants L'Oreal "the exclusive right and license to exploit the [Armani Marks]," (Def. Ex. D § 2.1), the agreement imposes several restrictions on L'Oreal's license. For example, it (1) grants L'Oreal a license only for the "United States of America and its territories and possessions," (id. §§ 1.7, 2.1); (2) requires prior written approval of PCI for certain actions related to the use of the Armani Marks, (id. § 2.2); and (3) vests PCI with the right to control the manufacturing and packaging quality and to inspect L'Oreal's facilities, (id. § 6.4).  Significantly, the agreement expressly states that the Armani Marks "are and remain the sole property of the Trade[-]Marks Owner, PCI or other owners . . . .  Licensee only has the use thereof within the limits set by this agreement and such use, whatever its duration shall in no way be prejudicial to the Owners' rights."  (Id. § 4.1.)  It further prohibits L'Oreal from acting as "an agent of PCI" or making "any commitment in the name of PCI."  (Id. § 2.4.)  Moreover, pursuant to the PCI/L'Oreal agreement, L'Oreal is to "inform PCI of any infringement or threatened infringement which might come to its notice and will—if requested by PCI—fully cooperate at Trademark Owner's expense to refrain them.  The conduct of possible proceedings shall be under the control of the Trademarks Owners or his agent and at their expenses."  (Id. § 4.3.)

Such express limitations on L'Oreal's rights to the Armani Marks cannot be interpreted to grant a property interest or to transfer ownership to L'Oreal.  See Prince of Peace, 760 F.

---

[11]    At oral argument, L'Oreal clarified the relationship between the two Armani agreements.  (Tr. 81:3-5 ("[PCI] is the entity by which L'Oreal S.A. made a formal agreement between L'Oreal S.A. and [L'Oreal].").)  Because PCI replaced L'Oreal S.A. in the Armani/L'Oreal S.A. Agreement, it became the exclusive licensee of the Armani Marks.  Pursuant to the PCI/L'Oreal Agreement, PCI, in effect, granted L'Oreal a sub-license to use the Armani Marks in the United States and its territories.

Supp. 2d at 391-92; G & F Licensing Corp. v. Field & Stream Licenses, Co., No. 09 Civ. 10197 (LTS)(GWG), 2010 WL 2900203, at *2 (S.D.N.Y. July 16, 2010) (finding no assignment where the license agreement contained limitations on plaintiff's use of the marks, including that plaintiff (1) must maintain the quality of the mark, (2) permit the licensor to inspect manufacturing, (3) pay a license fee, and (4) obtain authorization from licensor to prosecute any trademark infringement actions); Calvin Klein, 2001 WL 1456577, at *5 (finding no assignment where the license agreement set forth numerous rights and obligations consistent with a licensing agreement and not an assignment, including geographical limitations, the requirement that plaintiff maintain the quality of the mark, and representations that the licensor reserves its ownership and good will). As the Second Circuit has recently stated, "Congress could easily have included 'licensee' or 'exclusive licensee' among the terms in 15 U.S.C. § 1127 that define 'registrant,'" but instead chose "to limit standing to parties having a more specific set of interests in the registered mark." FTE, 2013 WL 3970048, at *11.

L'Oreal also submitted a declaration from Jose Monteiro, Group Trademark and Intellectual Property Counsel at L'Oreal S.A., as well as a Confirmation of License executed by the registrant of the Armani Marks, both of which state that L'Oreal S.A. has delegated and assigned enforcement rights to L'Oreal. (See Pl. Opp'n Ex. 56 (Jose Monteiro Decl., Jan. 3, 2013) ¶ 8 ("L'Oreal S.A. has delegated and assigned all of its rights and obligations under the agreement with [Armani] with respect to the enforcement of the Armani Marks."); Pl. Opp'n Ex. 58 (Confirmation of License, Jan. 2013) (L'Oreal S.A.'s "affiliate, L'Oreal [] has been allowed to bring legal action against Trend Beauty.").) These statements, without more, however, are insufficient to establish that L'Oreal is the assignee of Armani pursuant to the PCI/L'Oreal Agreement. See FTE, 2011 WL 4005321, at *4-8 (although the trademark owner had expressly

affirmed plaintiff's authority over the relevant trademarks in decrees and letters both before and after the litigation commenced, the plaintiff was neither a legal representative nor an assignee of the trademark owner).

Moreover, to the extent that L'Oreal argues that the Monteiro Declaration and Confirmation of License effect an assignment of rights, (see Monteiro Decl. ¶¶ 13-14),[12] that argument necessarily fails.  Standing "must be assessed under the facts existing when the complaint is filed," Lujan v. Defenders of Wildlife, 504 U.S. 555, 569 n.4 (1992), and a *nunc pro tunc* assignment after the filing of a complaint cannot confer standing retroactively.  See id.; ID7D Co. v. Sears Holding Corp., No. 11 Civ. 1054 (VLB), 2012 WL 1247329, at *5 (D. Conn. Apr. 13, 2012) (collecting cases, in the patent infringement context, that hold that plaintiff cannot cure standing defects by executing *nunc pro tunc* assignments after the filing of a complaint).  A declaration and confirmation of license dated almost eighteen months after the commencement of the action cannot serve as a basis for standing.  In any event, these documents are insufficient to satisfy the assignment standard articulated above.

### (3)      Application to the Ralph Lauren Marks

L'Oreal further asserts that it is an assignee of Ralph Lauren's rights in the Ralph Lauren Marks pursuant to its exclusive license agreement with Ralph Lauren as well as a declaration provided by the company.  The Court disagrees.

The Ralph Lauren Agreement grants L'Oreal the "exclusive right, license and privilege" to use the Ralph Lauren Marks, . . . exclusive even as to the Licensor."  (Def. Ex. E § 2.2.)

---

[12]      The Monteiro Declaration states: "For the avoidance of doubt, this declaration will serve as an assignment effective June 19, 2011, authorizing L'Oreal USA, Inc. to act as L'Oreal S.A.'s exclusive agent and legal representative in enforcing the Armani Marks, including any pending civil actions, and any and all similar actions that may be initiated in the future against Trend Beauty in its sale of counterfeit and/or defaced goods bearing the Armani Marks."  It further states: "This declaration will also serve as an assignment to L'Oreal USA, Inc., effective June 19, 2011, of any and all of L'Oreal S.A.'s rights to bring this and any further claims against Trend Beauty regarding Trend Beauty's sale of counterfeit and/or defaced goods bearing the Armani Marks."

Moreover, the agreement grants L'Oreal the right to "take any action, legal or otherwise, in its own name and/or in the name of Licensor . . . to protect any trade name or trademark covered by the License."  (Id. § 7.1(e);[13] see also Pl. Opp'n Ex. 57 (Dalla Val Decl., Dec. 4, 2012) ¶ 3 (Pursuant to the Ralph Lauren Agreement, "L'Oreal USA, Inc. . . . has the right to prosecute enforcement actions against any party for the infringement of L'Oreal USA, Inc.'s exclusive rights in the Ralph Lauren Marks in the United States.").)

These rights notwithstanding, the agreement imposes several restrictions on L'Oreal's license that militate against a finding that it serves as an assignment.  For example, L'Oreal's license is limited to the United States, its territories and possessions, (Def. Ex. E § 1); L'Oreal is obligated to pay royalties to Ralph Lauren, (id. § 4); L'Oreal is required to maintain the trademarks' quality and workmanship, subject to inspection by Ralph Lauren, (id. § 7.2(d));[14] Ralph Lauren reserves the right to terminate the agreement for various reasons, including L'Oreal's failure to maintain the "high prestige and good will" of the marks, (id. §§ 7.2(e) &

---

[13]     Section 7.1(e) of the Ralph Lauren Agreement provides:

> Licensee shall have the right in its discretion, and with counsel of its own choosing, to take any action, legal or otherwise, in its own name and/or in the name of Licensor, at Licensee's discretion, to protect any trade name or trademark covered by the License from infringement, counterfeiting or passing off.  Prior to taking any such action, Licensee shall advise Licensor of its intention to commence the proposed action and thereafter at Licensor's request, shall promptly furnish Licensor with copies of relevant documents and keep Licensor advised of developments relating to the action.  Licensor shall cooperate with Licensee and, if requested, shall join as a plaintiff in any such action with counsel designated by Licensee.  Any legal expenses incurred in the prosecution of such action shall be borne by, and any money recoveries received as a result of such action shall belong to, Licensee; provided, however, that the net amount of any such recovery upon a final, non-appealable judgment, after deducting the aggregate amount of all and every cost and expense of such an action (including attorney's fees, court costs, printing fees, witness fees, etc.) shall be included in Licensee's Net Sales for the purpose of calculating the Royalty.

(Def. Ex. E § 7.1(e).)

[14]     Section 7.2(d) of the agreement provides: "The Royalty Products shall be of high quality and workmanship. For the purposes of ascertaining Licensee's compliance with the last preceding sentence, Licensee will permit duly authorized representatives of Licensor to inspect the Royalty Products and Licensee shall upon request of Licensor submit to Licensor samples of all such products."  (Ex. E.)

9.1(a));[15] and any registration of the relevant trade names are obtained "in the name of Licensor," (id. § 2.5(b); see also § 7.1(b)(i)).[16]  In light of these restrictions, the agreement is more akin to a licensing agreement than an assignment.  See FTE, 2013 WL 3970048, at *11 ("FTE has not cited any persuasive authority within or outside our Circuit holding that a valid assignment of a trademark right can occur when the putative assignor retains the right to rescind the trademark, to grant a license for its use to others, or to exclude others from using the mark.  We decline to create such a rule here."); G & F Licensing Corp., 2010 WL 2900203, at *2; Brooklyn Bottling of Milton, N.Y., Inc. v. Ecuabeverage Corp., No. 07 Civ. 8483 (AKH), 2008 WL 577288, at *2 (S.D.N.Y. Mar. 3, 2008) (finding no assignment, despite language in an agreement authorizing licensee to bring enforcement actions, where the agreement restricted the license to a geographical location and expressly stated that licensor remained the owner of the trademarks); Prince of Peace Enters. v. Top Quality Food Market, LLC, No. 07 Civ. 349 (RJH), 2007 WL 704171, at *3 (S.D.N.Y. Mar. 7, 2007) (finding no assignment where a distribution agreement granted plaintiff the exclusive use of and enforcement rights to various trademarks but explicitly permitted licensor to terminate the license); cf. Telebrands Corp., 719 F. Supp. 2d at 293 (finding an assignment where the license agreement granted the licensee "broad rights to sell [the product] throughout the United States, royalty free, for a potentially unlimited period," but did not provide for any restrictions on the licensee's ability to enforce the trademarks or other

---

[15]    Section 9.1(a) of the Ralph Lauren Agreement is currently redacted from the version of the agreement filed in this action.  In an Order dated December 17, 2012, the Court permitted the parties to file this agreement in redacted form because at the time, such information did not appear to be relevant to the summary judgment motions.  (Dkt. No. 21.)  Having reviewed the parties' submissions, however, the Court now finds that § 9.1(a) is in fact relevant to its determinations and therefore must be publicly accessible pursuant to Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 120 (2d Cir. 2006).  Accordingly, the parties are directed to file a new version of the Ralph Lauren Agreement from which § 9.1(a) is not redacted.

[16]    Section 7.1(b)(i) of the agreement provides: "Licensor shall have the right, to be exercised in its sole discretion, to control the prosecution of each application to register the First Trademarks in the United States Patent and Trademark Office, including the right to seek either appellate or de novo review of any final administrative determination by the United States Patent and Trademark Office."  (Ex. E.)

intellectual property of the product and licensee was to keep any damages awarded in such infringement actions).

As an alternate basis for standing, L'Oreal submitted a declaration from Anna Dalla Val, Vice President and Secretary at PRL USA Holdings, Inc., in which she states that her declaration would serve as an assignment, effective June 19, 2011, authorizing L'Oreal to enforce the Ralph Lauren Marks against Trend Beauty.  (Pl. Opp'n Ex. 57 ¶¶ 6-7.)[17]  As discussed above, however, a declaration executed after the commencement of this action cannot serve as the basis for standing.  Lujan, 504 U.S. at 569 n.4; ID7D Co., 2012 WL 1247329, at *5.  Accordingly, the Court finds that L'Oreal does not have standing as Ralph Lauren's assignee for purposes of § 1114.

### (b)   Legal Representative

### (1)   Legal Standard

Earlier this month, in a matter of first impression, the Second Circuit in FTE interpreted the term "legal representative" to require a party to show that it "has the authority to appear on behalf of the registrant/owner with respect to the registrant/owner's legal interests and the registrant/owner is unable or incapable of representing itself and enforcing its own rights."  FTE, 2013 WL 3970048, at *14, 16.  In adopting this definition, the Court rejected an interpretation that would include a party that had "been given rights conferring control over trademarks ultimately owned by others."  FTE, 2013 WL 3970048, at *14.  Moreover, a legal representative

---

[17]      Dalla Val declares that, "For the avoidance of doubt, this declaration will serve as an assignment effective June 19, 2011, authorizing L'Oreal USA, Inc. to act as the exclusive agent and legal representative of PRL in enforcing the Ralph Lauren Marks against Trend Beauty Corporation or any entity in privity with Trend Beauty Corporation (collectively, "Trend Beauty") arising out of its sale of counterfeit and defaced goods bearing the Ralph Lauren Marks, including any pending civil actions, and any and all similar actions that may be initiated in the future."  (Dalla Val. Decl. ¶ 6.)  She further states that, "This declaration will also serve as an assignment to L'Oreal USA, Inc., effective June 19, 2011, of any and all of PRL's rights to bring this and any further claims against Trend Beauty arising out of Trend Beauty's sale of defaced goods bearing the Ralph Lauren Marks."  (Id. ¶ 7.)

may only assert claims on behalf of, and recover damages incurred by, the registrant and/or owner; claims personal to the legal representative are not permitted because the representative "lacks independent ownership rights."  FTE, 2011 WL 4005321, at *6.

### (2)    Application to the Armani and Ralph Lauren Marks

Pursuant to this standard, L'Oreal does not qualify as the legal representative of either Armani or Ralph Lauren.  Although L'Oreal has permission to pursue this litigation in its own name on behalf of Armani and Ralph Lauren, (see Confirmation of License; Dalla Val Decl. ¶ 3), L'Oreal has not demonstrated that either Armani or Ralph Lauren is unable or incapable of enforcing their own rights.  See FTE, 2011 WL 4005321, at *5 (Although plaintiff "has permission to pursue this litigation in its own name from and at the convenience of the [trademark owner]," it failed to provide "an explanation of the need for it [to do so] on behalf of the [owner], which is the real party in interest whose alleged ownership rights are implicated by this action.").[18]

Thus, because L'Oreal is not the owner or registrant of the Armani or Ralph Lauren Marks, or the assignee or legal representative of the registrants, it does not have standing to bring its § 1114(1) claims.  These claims must thus be dismissed.

### 2.    Trademark Dilution Pursuant to 15 U.S.C. § 1125(c)

L'Oreal also brings a trademark dilution claim pursuant to § 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), with respect to the GIORGIO ARMANI and ACQUA DI GIO marks.  Trend Beauty contends that L'Oreal lacks standing to bring this claim because it is not the owner of

---

[18]    Moreover, to the extent that L'Oreal argues that its suit should be permitted to proceed because Armani and Ralph Lauren have ratified the litigation, that argument fails as well.  Federal Rule of Civil Procedure 17(a) provides that "[a]n action must be prosecuted in the name of the real party in interest, but that a court may not dismiss an action on such grounds until "a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action."  This rule, however, cannot serve as a means to "extend[] standing . . . through 'ratification.'"  FTE, 2013 WL 3970048, at *17.

either mark.  L'Oreal responds that the owners of the marks authorized L'Oreal to commence this action and declared that L'Oreal serves as its legal representative and assignee.

"Section 43(c) of the Lanham Act allows only 'the owner of a famous mark,' to 'be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution.'"  Prince of Peace, 760 F. Supp. 2d at 392-93 (quoting § 1125(c)(1)).  Although there is limited authority in this Circuit suggesting that an exclusive licensee "might have standing to sue under [§] 43(c) if the license agreement in question grants the licensee especially strong ownership rights," id. at 393 (citing World Championship Wrestling v. Titan Sports, Inc., 46 F. Supp. 2d 118, 122 (D. Conn. 1999)), the Court agrees this Court's decision in Prince of Peace that "[a]bsent a valid assignment transferring all ownership rights in a mark, even an exclusive licensee and distributor . . . is not a mark's 'owner' for purposes of Section 43(c)," id. at 394; see also Iconix Brand Grp., Inc. v. Bongo Apparel, Inc., No. 06 Civ. 8195 (DLC), 2008 WL 2695090, at *5 (S.D.N.Y. July 8, 2008) ("[Plaintiff] concedes that it is 'neither the registrant nor the owner' of the Bongo mark, and thus that it does not have standing to pursue its claims for . . . dilution under 15 U.S.C. § 1125(c).").  In reaching this conclusion, the Prince of Peace court relied on a case out of the Northern District of California, which noted that "[n]othing in the Lanham Act suggests that 'owner' in § 1125(c)(1) includes by definition anything other than the actual owner of the famous mark," for the "Lanham Act itself . . . suggests that when Congress desires to give non-owners the right to bring legal action under the Act, it says so."  Id. (quoting STX, Inc. v. Bauer USA, Inc., No. C 96-1140 FMS, 1997 WL 337578, at *4 (N.D. Cal. June 5, 1997)).  Thus, because L'Oreal is not the owner of the GIORGIO ARMANI and ACQUA DI GIO marks and the Court has already concluded that the PCI/L'Oreal agreement does not effect

a valid assignment of ownership rights, L'Oreal lacks standing to bring its § 1125(c) trademark dilution claim.  It must thus be dismissed.

> **B.      Unfair Competition and False Designation of Origin Claims Pursuant to 15 U.S.C. § 1125(a)[19]**

L'Oreal also brings federal unfair competition claims against Trend Beauty pursuant to § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), for its sale of counterfeit and decoded fragrances.  Trend Beauty concedes that L'Oreal is entitled to summary judgment on its § 1125(a) claim with respect to the 191 units of counterfeit ACQUA DI GIO fragrances.  (Def. Opp'n 17.)  Accordingly, summary judgment is granted to L'Oreal as to these fragrances.

The Court next addresses the parties' arguments with respect to the Armani and Ralph Lauren decoded fragrances.   Section 43(a) prohibits any misrepresentation likely to cause confusion about the source of a product or service, in particular the use by any person of:

> any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin . . . likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association . . . with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

§ 1125(a)(1).  "Section 43(a) is a broad federal unfair competition provision which protects unregistered trademarks similar to the way that section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), protects registered trademarks."  Chambers v. Time Warner, Inc., 282 F.3d 147, 155 (2d Cir. 2002); Bulman v. 2BKCO, Inc., 882 F. Supp. 2d 551, 558 (S.D.N.Y. 2012) ("Section 43(a) protects both registered and unregistered marks.").  To bring a trademark infringement claim under either Lanham Act statute, a plaintiff must demonstrate: "(1) that it has a valid mark that is entitled to protection under the Act and (2) that [the defendant's] actions are likely to cause confusion as to the origin of the mark."  Gucci Am., Inc. v. Duty Free Apparel, Ltd., 286

---

[19]      There is no dispute that L'Oreal has standing to bring its § 1125(a) unfair competition claims.

F. Supp. 2d 284, 287 (S.D.N.Y. 2003); see also Technomarine SA v. Jacob Time, Inc., 905 F. Supp. 2d 482, 487 (S.D.N.Y. 2012) ("The same analysis [as § 1114(1)(a)] applies to claims of false designation of origin under § 43 of the Lanham Act.").

The allegedly infringing fragrances in this case are known as "gray goods."  Although this term typically refers to goods that are manufactured outside the United States but imported into the U.S. without the consent of the U.S. trademark holder, see K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 281 (1988), courts have extended this definition to include trademarked goods sold by unauthorized retailers, such as the L'Oreal fragrances at issue here.  See TechnoMarine SA, 905 F. Supp. 2d at 488; Dan-Foam A/S v. Brand Named Beds, LLC, 500 F. Supp. 2d 296, 308 & n.103 (S.D.N.Y. 2007).  As a general rule, the Lanham Act does not impose liability for such unauthorized sales "because such a sale does not inherently cause confusion or dilution."  Zino Davidoff SA v. CVS Corp., 571 F.3d 238, 243 (2d Cir. 2009) (citing Polymer Tech. Corp. v. Mimran, 975 F.2d 58, 61 (2d Cir. 1992)).  The Second Circuit has held, however, that "goods are not genuine" and their distribution could constitute infringement "if they do not conform to the trademark holder's quality control standards," id. (citing Polymer Tech. Corp. v. Mimran, 37 F.3d 74, 78 (2d Cir. 1994)), or "if they differ materially from the product authorized by the trademark holder for sale," id. (citing Original Appalachian Artworks, Inc. v. Granada Elecs., Inc., 816 F.2d 68, 73 (2d Cir. 1987)).[20]  L'Oreal claims that Trend Beauty's sale of decoded fragrances violates the Lanham Act because such goods do not conform to its quality control standards and differ materially from the genuine product.  The Court addresses each argument in turn.

---

[20]     These theories of infringement apply equally to claims pursuant to §§ 1114(1) and 1125(a).  See Bel Canto Design, Ltd. v. MSS Hifi, Inc., 837 F. Supp. 2d 208, 224 n.2 (S.D.N.Y. 2011) (citing Zip Intern. Grp., LLC v. Trilini Imports, Inc., No. 09 Civ. 2437 (JG)(VVP), 2011 WL 2132980, at *4 n.5 (E.D.N.Y. May 24, 2011)).

### 1. Quality Control

"One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark." El Greco Leather Prods. Co. v. Shoe World, Inc., 806 F.2d 392, 395 (2d Cir. 1986). "[T]he interference with the trademark holder's legitimate steps to control quality unreasonably subjects the trademark holder to the risk of injury to the reputation of its mark." Zino Davidoff, 571 F.3d at 243. Thus, "[d]istribution of a product that does not meet the trademark holder's quality control standards . . . is deemed for Lanham Act purposes not to be the genuine product of the holder, and its distribution constitutes trademark infringement." Warner-Lambert Co. v. Northside Dev. Corp., 86 F.3d 3, 6 (2d Cir. 1996). To be entitled to relief, a trademark holder need not adopt the most stringent quality control standards available. Id. Rather, the "trademark holder must demonstrate only that: (i) it has established legitimate, substantial, and nonpretextual quality control procedures; (ii) it abides by these procedures; and (iii) the non-conforming sales will diminish the value of the mark." Id. "[F]or purposes of analyzing trademark infringement involving interference with quality control procedures, 'the actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain.'" Zino Davidoff, 571 F.3d at 246 (quoting El Greco, 806 F.2d at 395).

#### (a) Seal Vector

L'Oreal's use of the Seal Vector is a quality control measure that satisfies the Warner-Lambert three-part test. L'Oreal explains, and Trend Beauty does not dispute, that the Seal Vector is used for anti-counterfeiting and that such purpose is non-pretextual. (Def. Resp. 56.1 ¶ 59 (Trend Beauty does not contest that the Seal Vector is used for anti-counterfeiting purposes); Def. Mem. 7 ("The Seal Vector which is quite limited in use, does not present a

pretext issue.").)  The use of coding to identify counterfeit goods has been approved by the Second Circuit as a legitimate quality control measure.  See Zino Davidoff, 571 F.3d at 244. L'Oreal employees testified that the Seal Vector is nearly impossible to copy and a counterfeit can be identified with the naked eye.  They further testified that employees are educated as to how to identify a genuine Seal Vector from a counterfeit one.  (McCarthy Dep. 47:16-21 (describing the differences as "striking").)  The Seal Vector is therefore a legitimate, substantial and non-pretextual quality control measure, as conceded by Trend Beauty, and the sale of goods without the Seal Vector makes it more difficult to remove counterfeits from the market, thereby diminishing the trademark's value.  Thus, fragrances with the Seal Vector removed are no longer genuine goods pursuant to § 1125(a) and Trend Beauty's distribution of them constitutes infringement.  The Court therefore grants L'Oreal summary judgment on its § 1125(a) claims as to those fragrances from which the Seal Vector has been removed.

### (b)   AD/QA Code

L'Oreal's use of the AD/QA Code, however, presents questions of fact precluding summary judgment.  While acknowledging that the AD/QA Code is used in part for "anti-diversion" purposes, (Pl. 56.1 ¶ 59), L'Oreal contends that the code allows it "to control the quality of its products and combat counterfeiting and theft," and that removal of the code makes it more difficult to undertake these efforts, thus diminishing the value of the marks.  (Pl. Reply 2.)  Trend Beauty responds that summary judgment is not appropriate because there is a question of fact regarding whether the AD/QA Code is indeed used for the purposes proffered by L'Oreal or whether such purposes are a pretext for the true purpose of stemming diversion.  Although Trend Beauty's distribution of the L'Oreal luxury fragrances with decoded AD/QA Codes may indeed constitute infringement, there nonetheless exist disputed issues of fact as to the purpose of

the AD/QA Code.  The Court is thus not in a position to find as a matter of law that the AD/QA Code serves a "substantial, non-pretextual" quality control purpose.

The use of coding to identify counterfeit and stolen goods and control the quality of its products is undoubtedly a legitimate quality control measure, see Zino Davidoff, 571 F.3d at 244, and L'Oreal has adduced some evidence to show that the use of the AD/QA Code for these purposes is both substantial and non-pretextual.  At least one L'Oreal employee testified that the removal of the AD/QA Code hinders L'Oreal's ability "to determine the source of the product or to determine if the product was stolen or counterfeit."  (See, e.g., Barden Dep. 158:14-21.) L'Oreal employees further testified to L'Oreal's efforts to purchase decoded fragrances at unauthorized retailers through its Buy Back Program, some of which were indeed counterfeit. (See McCarthy Dep. 127:14-24; Barden Dep. 157:6-25; Def. Opp'n Ex. U at 39 (Buy Back data chart); Def. Opp'n Ex. V at 3 (Buy Back report finding that twelve units purchased had unreadable AD/QA Codes, four of which were counterfeit).)  Moreover, L'Oreal employees testified that when the AD/QA code is removed, there is "no way to tell . . . if the product [would be] part of [a] recall."  (See, e.g., McCarthy Dep. 148:18-21.)

This evidence—which largely consists of conclusory statements from L'Oreal or its employees—is, however, insufficient to establish as a matter of law that the use of the AD/QA Code to combat counterfeiting and theft, while legitimate, is also substantial and non-pretextual. See Monsanto Co. v. Haskel Trading, Inc., 13 F. Supp. 2d 349, 356 n.4 (E.D.N.Y. 1998) ("Under the holding in Warner-Lambert, the plaintiffs must do more than merely assert the existence of quality control measures . . . . [T]hey must prove that those procedures are legitimate, substantial, and non-pretextual . . . ."); see also El Greco, 806 F.2d at 395 (describing the procedures as "integral" parts of the plaintiff's quality control efforts).  For example, although

L'Oreal presented some documentation demonstrating that it works with law enforcement to recover counterfeit and stolen goods, the documents do not explain how the AD/QA Code is utilized in this effort.  Similarly, although there need not be a recall for a code to meet the Warner-Lambert test, see Zino Davidoff, 571 F.3d at 245, L'Oreal fails to explain how it even uses the AD/QA Code to identify and resolve quality issues with its fragrances.  This is in contrast to Zino Davidoff, in which, at the preliminary injunction stage, the Second Circuit affirmed that Davidoff had demonstrated both that it "regularly train[ed] retailers, private investigators and U.S. Customs to use UPCs . . . to identify and seize counterfeit goods," id. at 244-45, and that it "used the full traceability offered by the UPC system to quickly identify and rectify possible quality issues with its fragrance products," Zino Davidoff SA v. CVS Corp., No. 06 Civ. 15332 (KMK), 2007 WL 1933932, at *8 (S.D.N.Y. July 2, 2007); see also Bel Canto Design, Ltd. v. MSS Hifi, Inc., 837 F. Supp. 2d 208, 229-30 (S.D.N.Y. 2011) (finding, at the preliminary injunction stage, that plaintiff's use of serial numbers to "identify defective components and institute targeted recalls," satisfied the quality control doctrine).

This ruling is further supported by the evidence in the record regarding L'Oreal's use of the AD/QA Code to combat diversion.  Although the Buy Back program may well be used for both anti-counterfeiting and anti-diversion purposes, the record before it documents primarily how the Buy Back is used for anti-diversion efforts.  (See Def. Opp'n Ex. T (Buy Back manual provided to third-party vendor instructing it to purchase goods only with intact, unaltered codes); Def. Opp'n Ex. U (data collected shows that the majority of units had readable AD/QA codes); Def. Opp'n Ex. V (report generated for anti-diversion purposes states that of the 600 units purchased, 588 or 98% had a readable AD/QA code in one Buy Back period).)  There is also testimony from L'Oreal's Chief Security Officer that unauthorized distributors in the United

31

States have been terminated as a result of their diversion activities.

In reaching this conclusion, the Court is not questioning the business decisions of L'Oreal, as the Second Circuit has instructed that courts should defer to the trademark holder's judgment in determining how to manage the quality control of its product.  See Warner-Lambert, 86 F.3d at 7.[21]  Rather, it is solely assessing the evidence before it.  As long as the coding system implemented by the trademark holder "enhances the effectiveness" of its ability to "detect and prevent" the sale of counterfeits, for example, the fact that there might be other methods of doing so does not negate the value of the code in pursuing that goal.  See Zino Davidoff, 571 F.3d at 244.

Nonetheless, in light of the limited evidence submitted by L'Oreal to support its position that the AD/QA Code is indeed used for the legitimate purposes of anti-counterfeiting, anti-theft and quality control, L'Oreal has failed to meet its burden of showing that "there is no genuine dispute as to any material fact" and that it is thus "entitled to judgment as a matter of law."  Fed. R. Civ. P 56(a).  Accordingly, L'Oreal's motion for summary judgment is denied as to its remaining § 1125(a) claims.[22]

### 2.    Materially Different Goods

L'Oreal also claims that Trend Beauty's sale of decoded fragrances violates the Lanham Act because decoding "deprives the products bearing the L'Oreal Marks of their luxury character."  (Pl. Mem. 14.)  Trend Beauty responds that side-by-side comparisons of the coded and decoded units "fail to reflect any differences in the appearance of the packaging between the

---

[21]    For that reason, the Court does not give significant consideration to two facts highlighted by Trend Beauty: (1) L'Oreal employees are able to identify counterfeits through visual observation, without the assistance of the AD/QA Code, and (2) the Daylot Code can be used to control the quality of products and identify stolen goods.

[22]    Because the Court has found that L'Oreal has not satisfied the first two prongs of the quality control test at this stage of the litigation, it need not reach the third prong at this time.

coded and decoded goods," and that, at a minimum, this is a question to be resolved by the jury. (Def. Opp'n 12.)  Although L'Oreal has submitted some evidence that the packaging of Trend Beauty's decoded goods is frayed, faded and otherwise tampered with, whether they "differ materially" from the coded goods is a fact-intensive inquiry that is appropriately reserved for the jury.

Goods are not genuine and can constitute trademark infringement if they "differ materially from the product authorized by the trademark holder for sale." Zino Davidoff, 571 F.3d at 243 (citing Original Appalachian Artworks, Inc., 816 F.2d at 73).  As the Second Circuit explained in affirming the issuance of a preliminary injunction in Zino Davidoff:

> Characteristically, sellers of luxury goods, such as fragrances, go to great length and expense to present the trademarked merchandise in an appealing packaging. For a seller to damage the packaging by cutting away portions or applying acids to blur markings detracts from the value of the product. The evidence showed that removal of the UPC required tampering-the cutting of the packaging, the application of chemicals to wipe away the labeling, and the grinding of the bottles-all of which is visible to a consumer.  It is a logical inference that consumers may regard a product whose packaging has been tampered as inferior and perhaps suspicious.  Mutilation of packaging to conceal markings may lead the consumer to suspect that the item is stolen merchandise, or is defective and has been diverted from a recall, or is otherwise untrustworthy. . . . In short, trademarked goods whose luxury packaging is damaged are materially different from those that are intact.

Id. at 246; see also Dan-Foam A/S v. Brand Named Beds, LLC, 500 F. Supp. 2d 296, 313 (S.D.N.Y. 2007) ("Differences in product packaging have been found to constitute material differences in a variety of gray goods cases.").  Moreover, "[i]n the context of gray-market goods, in comparing the trademark holder's product with the gray-market product, we apply a low threshold of materiality, requiring no more than a slight difference which consumers would likely deem relevant when considering a purchase of the product." Zino Davidoff, 571 F.3d at 246.

It is undisputed that the process of decoding involves "removing L'Oreal's cellophane wrapper, removing the bottle from the box, and taking apart . . . the secondary packaging." (Pl. 56.1 ¶ 63.) The parties disagree, however, about the visible effect this process has on the secondary packaging. At oral argument, L'Oreal submitted examples of coded fragrances and decoded fragrances sold by Trend Beauty for the Court to examine for material differences.[23] These fragrances were purchased during L'Oreal's Buy Back and have since been maintained in a locked room at L'Oreal's counsel's office. (See Nathaniel Read Decl., Feb. 19, 2013, ¶¶ 3, 26-28; Pl. Exs. 62 & 63.) Although some decoded units appear different than the coded products in that they are frayed, scratched and/or faded, other units do not appear to have any material differences from the coded fragrances. (See Tr. 19:15-20:19 (discussing POLO BLUE (Ex. 38)), 30:2-25 (discussing POLO BLACK (Ex. 36)).) A determination as to whether the decoded products materially differ from the coded ones in a manner that would be "visible to a consumer" in this case is a fact-intensive inquiry that is not ripe for summary judgment. Accordingly, L'Oreal's motion for summary judgment as to its remaining § 1125 claims is denied on this theory as well.[24]

## C.   Trade Dress Infringement Pursuant to 15 U.S.C. § 1125(a)

L'Oreal also moves for summary judgment on its § 1125(a) trade dress claims. Trend Beauty moves for judgment on the pleadings as to those claims and alternatively opposes

---

[23]    Trend Beauty also provided examples of coded fragrances purchased from Bloomingdale's and decoded fragrances recently purchased from Walgreens and CVS. (Tr. 65:19-22.) Although Meltzer declared that these decoded units are representative of Trend Beauty's decoded fragrances, because they are not in fact units that were sold by Trend Beauty, they are not relevant to the Court's inquiry regarding whether there were material differences between coded and decoded goods sold by Trend Beauty.

[24]    Trend Beauty also moves for summary judgment on L'Oreal's § 1125(a) claims under the theory that L'Oreal is bringing false designation of origin "passing off" claims. L'Oreal, however, is not asserting such claims in this action; it is instead bringing a § 1125(a) claim for trademark infringement and unfair competition. Accordingly, Trend Beauty's motion is denied as to these claims.

summary judgment.[25]  As L'Oreal explains, the focus of its trade dress claims is that "decoded and counterfeit units are not the luxury products that L'Oreal manufactured and offered for sale." (Pl. Reply 4.)

The statutory protections afforded to unregistered trademarks under § 1125(a) also extend to trade dress.  See Fun-Damental Too, Ltd. v. Gemmy Indus. Corp., 111 F.3d 993, 999 (2d Cir. 1997).  "The concept of trade dress encompasses the design and appearance of the product together with all the elements making up the overall image that serves to identify the product presented to the consumer."  Id.  Such elements include "the appearance of labels, wrappers, and containers used in packaging a product as well as displays and other materials used in presenting the product to prospective purchasers."  Id.  "To establish a claim of trade dress infringement under § 43(a), [a] plaintiff must first demonstrate that its trade dress is either inherently distinctive or that it has acquired distinctiveness through a secondary meaning."  Id. (emphasis removed) (citing Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 769 (1992)).  An "inherently distinctive trade dress," however, is only entitled to protection if "it is also nonfunctional."  Id. (citing Two Pesos, Inc., 505 U.S. at 769).  "Second, [a] plaintiff must demonstrate that there is a likelihood of confusion between defendant's trade dress and plaintiff's."  Id. (citing Two Pesos, Inc., 505 U.S. at 769-70).  In a gray goods case such as this one, the likelihood of confusion element is satisfied by demonstrating that the goods are not genuine because they do not conform to the trade dress holder's quality control standards or they differ materially from the authorized product.  See Zino Davidoff, 571 F.3d at 243; TechnoMarine SA, 905 F. Supp. 2d at 488 (explaining that likelihood of confusion is alleged

---

[25]      In its motion for judgment on the pleadings, Trend Beauty asserts that L'Oreal failed to adequately describe the distinctive features of the trade dress of the fragrances.  The Court disagrees.  The undisputed descriptions of the products provided by L'Oreal, along with the photographs and exhibits it provided, are more than adequate for the Court to assess the products' trade dress.  Accordingly, Trend Beauty's motion for judgment on the pleadings is denied as to these claims.

when goods are asserted to not be genuine).

As discussed below, L'Oreal's trade dress is inherently distinctive and non-functional. Because the Court has already found that units with decoded Seal Vectors are not genuine products, L'Oreal is entitled to summary judgment on its trade dress infringement claim related to fragrances with decoded Seal Vectors.   As to the remaining fragrances, however, for the reasons explained in §§ III.B.1.b and III.B.2, questions of fact remain regarding whether these products are genuine or non-genuine, and thus satisfy the likelihood of confusion element, and summary judgment must thus be denied.

### 1.      Distinctiveness

"The focus of the distinctiveness inquiry, and the ultimate test of protectability under the Lanham Act, is whether the plaintiff's trade dress is capable of distinguishing the plaintiff's goods from those of others."   Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC, 813 F. Supp. 2d 489, 538 (S.D.N.Y. 2011) (quoting Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 743 (2d Cir. 1998)).   The Second Circuit evaluates the inherent distinctiveness of a product's packaging on a spectrum of increasing distinctiveness: "generic, descriptive, suggestive, or arbitrary/fanciful."   Fun-Damental Too, Ltd., 111 F.3d at 1000 (citing Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 9 (2d Cir. 1976)).   "Suggestive and arbitrary or fanciful trade dresses are deemed inherently distinctive and thus always satisfy the first prong of the test for protection."   Id.

Courts must evaluate the distinctiveness of a trade dress "by looking at all its elements and considering the total impression the trade dress gives to the observer."   Id. at 1001; see also Paddington Corp. v. Attiki Importers & Distributors, Inc., 996 F.2d 577, 584 (2d Cir. 1993) ("While each of the [] elements [of a product's trade dress] individually would not be inherently

distinctive, it is the combination of elements and the total impression that the dress gives to the observer that should be the focus of a court's analysis of distinctiveness.").  In the context of packaging, the Second Circuit has explained that because "the varieties of labels and packaging available to wholesalers and manufacturers are virtually unlimited . . . a product's trade dress typically will be arbitrary or fanciful and meet the inherently distinctive requirement for § 43(a) protection."  Fun-Damental Too, Ltd., 111 F.3d at 1001.  It cautioned, however, that this principle "is [not] hard and fast, and analysis will always require a look at the product and the market in which it competes."  Landscape Forms, Inc. v. Columbia Cascade Co., 113 F.3d 373, 379 (2d Cir. 1997).  For example, "where it is the custom in a particular industry to package products in a similar manner, a trade dress done in that style is likely to be generic."  Mana Prods., Inc. v. Columbia Cosmetics Mfr., Inc., 65 F.3d 1063, 1069-70 (2d Cir. 1995).

Trend Beauty contends that L'Oreal's secondary packaging "is no more distinctive than other high-end, luxury fragrances."  (Def. Opp'n 16.)  The Court disagrees and finds the packaging to be inherently distinctive.  The fragrances are packaged in boxes of different sizes and colors.  The boxes are adorned with distinct designs and borders, and the name of the fragrance is displayed in different fonts and sizes.  (See infra § I.A.3 for a description of the secondary packaging.)  Accordingly, the Court finds that the secondary packaging of the relevant fragrances is arbitrary or fanciful and thus inherently distinctive.  See Fun-Damental Too, Ltd., 111 F.3d at 1001.

### 2.      Functionality

L'Oreal asserts that that the "decorative and trademark elements of the distinctive trade dress for each L'Oreal product are not functional, as they are not 'essential' to the packaging and sale of perfume."  (Pl. Mem. 17.)  Trend Beauty responds that L'Oreal's trade dress is functional

as it "serves the function of exuding an aura of high quality."  (Def. Opp'n 16.)

"[A] product feature is functional, and cannot serve as a trademark, if it essential to the use or purpose of the article or if it affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159, 165 (1995) (internal quotation marks omitted).   In cases involving an aesthetic feature, the dress is also functional, and therefore ineligible for protection, "where protection of the mark significantly undermines competitors' ability to compete in the relevant market." Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, 696 F.3d 206, 222 (2d Cir. 2012) (emphasis in original removed).  A defendant "bears the burden of proving functionality as a defense to [a] plaintiff's claim of infringement." Mana Prods., Inc., 65 F.3d at 1068.

Trend Beauty has failed to show that the L'Oreal fragrances' secondary packaging is functional.   The secondary packaging is not essential to the use of the fragrance itself. Moreover, although aesthetic features can be deemed functional, that is not the case here.  There are numerous variations and alternatives to the packaging and there is no evidence that L'Oreal's exclusive use of this secondary packaging would put any competitors at a significant disadvantage in the market.  See Christian Louboutin S.A., 696 F.3d at 222; Fun-Damental Too, Ltd., 111 F.3d at 1002 (among other factors, courts should consider alternatives to the useful features); Car-Freshener Corp. v. Excellent Deals, Inc., No. 10 Civ. 1391 (ENV), 2011 WL 3846520, at *3 (E.D.N.Y. Aug. 1, 2011) (finding that the packaging of car fresheners was non-functional); Fruit-Ices Corp. v. Coolbrands Int'l, Inc., 335 F. Supp. 2d 412, 423 (S.D.N.Y. 2004) (finding that the packaging of a frozen fruit bar was non-functional because it was not essential to the use, quality or purpose of the fruit bar, and different packaging is available and

successfully used by competitors); <u>Essie Cosmetics, Ltd. v. Dae Do Int'l, Ltd.</u>, 808 F. Supp. 952, 958, 959-60 (E.D.N.Y. 1992) (finding that a nail polish bottle was not functional because a bottle of a different shape or size could perform the same function as plaintiff's bottle, and the deprivation of the use of plaintiff's bottle would not put defendant at a disadvantage).

   **3.**  **Likelihood of Confusion**

  Although the Court finds that the secondary packaging is inherently distinctive and non-functional, L'Oreal's motion for summary judgment must be denied because questions of fact exist as to whether the sale of the L'Oreal fragrances with the AD/QA Code removed causes a likelihood of confusion. With respect to the counterfeit ACQUA DI GIO fragrances, as well as fragrances from which the Seal Vector was removed, however, summary judgment is appropriate.

  As noted above, in a gray goods case, the likelihood of confusion element is satisfied by demonstrating that the goods are not genuine because they do not conform to the trade dress holder's quality control standards or they differ materially from the authorized product. <u>See</u> <u>Zino Davidoff</u>, 571 F.3d at 243; <u>TechnoMarine SA</u>, 905 F. Supp. 2d at 488. For the reasons discussed in §§ III.B.1.b and III.B.2, the Court finds that summary judgment is not appropriate as to L'Oreal's trade dress claims related to the sale of L'Oreal fragrances with the AD/QA Code removed.

  **D.**  **Unfair Competition Under New York Common Law**

  L'Oreal also moves for summary judgment on its New York unfair competition claim. Trend Beauty contends that summary judgment should be denied because Trend Beauty's alleged bad faith is a question of fact.[26] (Def. Opp'n 19.) "A claim under the Lanham Act,

---

[26]  Trend Beauty also argues that L'Oreal's unfair competition and deceptive trade practice claims fail because L'Oreal submitted no evidence of counterfeit or decoded products emanating from Trend Beauty that were sold in

coupled with a showing of bad faith or intent, establishes a claim for unfair competition" under New York common law. Coach, Inc. v. Horizon Trading USA Inc., 908 F. Supp. 2d 426, 436 (S.D.N.Y. 2012).

According to L'Oreal's motion for summary judgment, it appears that it is bringing an unfair competition claim with respect to Trend Beauty's sale of counterfeit ACQUA DI GIO fragrances. Because Trend Beauty has conceded that it is liable under the Lanham Act for its sale of counterfeit goods, and the evidence confirms that Trend Beauty sold counterfeits, bad faith is presumed. See Coach, Inc., 908 F. Supp. 2d at 436; Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp., 689 F. Supp. 2d 585, 599 (S.D.N.Y. 2010). Trend Beauty's argument that the bad faith presumption may be rebutted when the defendant is not the counterfeiter is unsupported and without merit. See Coach, Inc., 908 F. Supp. 2d at 436 (applying the bad faith presumption against the seller—not the manufacturer—of the counterfeits); Fendi Adele S.R.L. v. Filene's Basement, Inc., 696 F. Supp. 2d 368, 389 (S.D.N.Y. 2010) (same). Accordingly, L'Oreal's motion is granted as to this claim.[27]

### E.   Deceptive Trade Practices Pursuant to N.Y. General Business Law § 349

Lastly, L'Oreal moves for summary judgment on its deceptive trade practices claim brought pursuant to New York General Business Law § 349. L'Oreal contends that Trend Beauty's conduct constitutes deceptive trade practices because (1) it engaged in deceptive acts by selling counterfeit and decoded fragrances bearing the L'Oreal Marks, (2) such sales are misleading, and (3) Trend Beauty's conduct has harmed L'Oreal. (Pl. Mem. 20-21.) Trend

---

New York. L'Oreal, however, did submit such evidence in support of its motion for summary judgment. (Pl. Ex. 68 (Invoice to Rite Aid in New York).) Accordingly, this argument fails.

[27]   In L'Oreal's complaint, it alleges a claim of unfair competition based on Trend Beauty's sale of counterfeit and decoded goods. It does not move for summary judgment, however, with respect to the sale of the decoded goods. In any event, L'Oreal's motion for summary judgment would be granted as to the fragrances with the Seal Vector removed and denied as to fragrances with only the AD/QA Code removed for the reasons articulated above.

Beauty responds that it was an innocent infringer that did not act willfully and thus could not be held liable under § 349.  It further contends that L'Oreal must also show that Trend Beauty's conduct injured the public interest, which it has failed to do.  (Def. Opp'n 19.)

New York General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service."  The New York Court of Appeals has further explained:

> A plaintiff under section 349 must prove three elements: first, the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act. Whether a representation, or an omission, the deceptive practice must be "likely to mislead a reasonable consumer acting reasonably under the circumstances."

Medisim Ltd. v. BestMed LLC, 910 F. Supp. 2d 591, 608 (S.D.N.Y. 2012) (quoting Stutman v. Chemical Bank, 95 N.Y.2d 24, 29 (2000)).  The majority view in this Circuit, however, is that "trademark . . . infringement claims are not cognizable under section[] 349 . . . unless there is a specific and substantial injury to the public interest over and above ordinary trademark infringement or dilution."  Coach, Inc., 908 F. Supp. 2d at 435; see also Philip Morris USA Inc. v. U.S. Sun Star Trading, Inc., No. 08 Civ. 0068 (KAM)(JO), 2010 WL 2133937, at *6 (E.D.N.Y. March 11, 2010) (collecting cases).  For example, an alleged injury of "confusion and deception of the consuming public . . . is not distinct from the very harm that trademark laws generally seek to redress and thus is not over and above ordinary trademark infringement."  Coach, Inc., 908 F. Supp. 2d at 436 (internal quotation marks omitted).

L'Oreal alleges that Trend Beauty's sale of counterfeit and decoded fragrances bearing the L'Oreal Marks is itself a specific and substantial injury to the public interest.  (Pl. Reply 6-7.) This conclusory statement, however, does not adequately explain how such injury is distinct from the very harm that trademark laws generally seek to redress.  L'Oreal has not proffered any

other evidence bearing on injury to the public interest. Its motion for summary must therefore be denied as to this claim.

### F.  Relief

L'Oreal is seeking a permanent injunction, damages, and attorney's fees and costs in this action. Pursuant to 16 U.S.C. § 1116, a plaintiff is entitled to a permanent injunction to prevent any future trademark infringement by a defendant. Because the Court grants L'Oreal's motion for summary judgment on its trademark and trade dress infringement claims with respect to Trend Beauty's sale of counterfeit L'Oreal fragrances, as well as ones with the Seal Vector removed, L'Oreal is entitled to an injunction prohibiting such infringing conduct. Accordingly, Trend Beauty is enjoined from selling any product bearing a counterfeit ACQUA DI GIO mark or any L'Oreal fragrances with the Seal Vector removed.

The Court otherwise defers ruling on injunctive relief as to the remaining decoded goods and damages until liability is resolved at trial.[28]

## IV.  Conclusion

For the foregoing reasons, Trend Beauty's motion for partial summary judgment and partial judgment on the pleadings is granted in part and denied in part, and L'Oreal's motion for summary judgment in granted in part and denied in part. In sum, L'Oreal's §§ 1114(1) and 1125(c) claims are dismissed for lack of standing. L'Oreal is entitled to summary judgment on its § 1125(a) trademark infringement and trade dress claims as well as its unfair competition claim, all with respect to Trend Beauty's sale of counterfeit ACQUA DI GIO fragrances. L'Oreal is also entitled to summary judgment on its § 1125(a) trademark and trade dress

---

[28]       The Court will resolve the parties' dispute regarding whether an award of actual damages under 15 U.S.C. § 1117(a) requires a finding of willfulness on the part of the infringer in advance of any verdict reached in this case. See Mr. Water Heater Enters., Inc. v. 1-800-Hot Water Heater, LLC, 648 F. Supp. 2d 576, 590 (S.D.N.Y. 2009) (noting the split in the district courts regarding whether § 1117(a) includes a willfulness element).

infringement claim with respect to Trend Beauty's sale of fragrances with the Seal Vector removed. The remaining claims—L'Oreal's § 1125(a) trademark infringement and trade dress claims related to Trend Beauty's sale of L'Oreal fragrances with the AD/QA Code removed as well as its deceptive trade practices claim—cannot be resolved at summary judgment as there are disputed issues of fact that must be resolved by the jury.

Trend Beauty is enjoined from selling any product bearing a counterfeit ACQUA DI GIO mark or any L'Oreal fragrances with the Seal Vector removed

A telephone conference has been scheduled for August 27, 2013 at 3:00 p.m. The parties shall jointly call Courtroom Deputy Allison Cavale at (212) 805-0162 at that time.

The Clerk of Court is respectfully directed to close the motions at Docket Numbers 22 and 30.

SO ORDERED.

Dated:      August 15, 2013
            New York, New York

                                        Ronnie Abrams
                                        United States District Judge